Robert K. Levenson
Florida Bar # 0089771
Senior Trial Counsel
Plaintiff Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, FL  33131
Telephone:  (305) 982-6341
Facsimile:  (305) 536-4154
levensonr@sec.gov

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW F. KERR,<br><br>Defendant. | Case No. C-<br><br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission alleges as follows:

## I.  INTRODUCTION

1. The Commission brings this insider trading action against the brother of an executive at AuthenTec, Inc., a Florida software and hardware development firm, for trading in the stock of AuthenTec, Inc., in advance of AuthenTec's July 27, 2012 announcement that Apple would acquire it for approximately $355 million in cash.

2. Apple first proposed the acquisition to AuthenTec at an in-person meeting at Apple's Cupertino, California headquarters on May 1, 2012.  In the following five weeks, Defendant Andrew F. Kerr, a brother of AuthenTec's Vice President of Software, bought 12,740 shares of AuthenTec stock based on material nonpublic information involving Apple's

negotiations with AuthenTec that he misappropriated from his mother. His mother had learned the information from another son, the AuthenTec vice president.

3. To buy the stock, Kerr incurred a margin debt in his brokerage account of almost $52,000 – an amount equal to nearly half his annual salary and a margin balance higher than any he had incurred in his account in the prior year. He also transferred significant amounts in his checking and savings accounts to his brokerage account.

4. Moreover, Kerr bought additional shares of AuthenTec stock in May 2012 by opening a brokerage account in the name of his mother-in-law, who had no prior investment experience or knowledge of securities. Kerr funded those trades in part by cashing out savings bonds and taking a loan from one of his credit cards.

5. After the announcement of Apple's acquisition of AuthenTec, Kerr reaped profits in the two trading accounts of more than $68,000.

6. As a result of the conduct described in this Complaint, Kerr violated Sections 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. The Commission seeks entry of injunction against Kerr to prevent future violations of Exchange Act Section 10(b) and Rule 10b-5, disgorgement of his ill-gotten gains with prejudgment interest, and a civil money penalty.

## II. JURISDICTION AND VENUE

7. The Commission brings this action pursuant to Sections 21(d), 21(e), and 21A of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78u-1. The Court has jurisdiction over this action pursuant to Sections 21(e), 21A and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e), 78u-1 and 78aa.

8. Furthermore, personal jurisdiction and venue in the Northern District of California are proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as Kerr resides in Livermore, California.

9. Kerr, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

### Intradistrict Assignment

10. Under Local Rule 3-2(d), this civil action should be assigned to either the San Francisco Division or the Oakland Division because Kerr resides in Alameda County.

### III. DEFENDANT AND OTHER RELEVANT INDIVIDUALS AND ENTITIES

11. Kerr, 41, resides in Livermore, California. In 2012, at the time of the conduct alleged in this Complaint, he resided in South Carolina. He moved to California in 2014.

12. Kerr's brother, 48, resides in North Carolina. From August 2009 through the completion of the acquisition in October 2012, the brother was Vice President of Software at AuthenTec, leading its software development. He resided in Melbourne, Florida at that time.

13. Kerr's mother, 73, is a resident of Naples, Florida. At the time of the alleged misconduct, she split her time residing in Naples and Basel, Switzerland.

14. Kerr's mother-in-law, 54, was a part-time resident of South Carolina in 2012, living with Kerr and his wife. Kerr claimed his mother-in-law as a dependent on his and his wife's joint tax return for the year 2011.

15. AuthenTec, or the Company, was a Delaware company headquartered in Melbourne, Florida until Apple acquired it. Before the acquisition, AuthenTec's common shares were registered pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ

COMPLAINT 3 CASE NO. C-_____

service under the ticker symbol "AUTH." AuthenTec was a software and hardware provider for fingerprint sensors used in mobile devices, computers and other machines.

16. Apple is a Delaware company headquartered in Cupertino, California and is one of the world's largest vendors of smartphones and other electronic devices.

## IV. FACTUAL ALLEGATIONS

### A. The Kerr Family

17. Kerr and his mother have a close relationship. They communicate regularly by phone and email. Among other things, they typically have discussed his children, his wife, his marital status, his house, his employment, his finances, his enrollment in graduate school in 2012, and other private family matters.

18. In early 2012, Kerr's mother-in-law asked him to help her in buying a house. Kerr's mother advised him not to assist.

19. In addition, Kerr's mother has given him money. She gave him $4,000 in January 2012 to buy a special mattress for his back problems. She also gave him $10,000 for business school, which he started in May 2012.

20. Kerr's brother and mother are also close and communicate by phone and email. From 2009 through 2012 when the brother resided in Melbourne, the mother often drove from her home in Naples to stay with the brother's teenage son when the brother had to travel for work. The brother usually told his mother where he was going and emailed her copies of his travel itinerary or schedule.

### B. Kerr's Finances

21. Kerr worked as a pharmacist in 2011 and 2012, making less than $120,000 in 2011. During that time, he supported his wife and two children (a third child was born in April

COMPLAINT 4 CASE NO. C-_____

2012), and helped support his mother-in-law. After paying his monthly mortgage, credit card bills, and other living expenses, little was left over.

22. From February through July 2012, the end-of-month balances in Kerr's checking account were less than $500, and he had bank overdrafts ranging from $20 to $335 due to payments for utilities.

23. Furthermore, as discussed below, he drove up the margin balance in his brokerage account extensively to buy AuthenTec in 2012.

### C. Apple's Acquisition Of AuthenTec

24. In late 2011 or early 2012, Apple and AuthenTec began discussing a licensing agreement where AuthenTec would license its fingerprint sensor technology to Apple for use on its iPhone. Discussions continued throughout the spring of 2012 on that licensing agreement.

25. Kerr's older brother, in addition to being Vice President of Software Development, was an AuthenTec executive and a member of the CEO's staff. He led the software group and was involved early on in AuthenTec's negotiations with Apple. He coordinated and assembled AuthenTec's technology presentations to Apple and advised the Company's CEO and legal and financial executives on the technical side of the negotiations.

26. On May 1, 2012, Apple formally proposed an acquisition of AuthenTec at an in-person meeting with AuthenTec's CEO and General Counsel at Apple's Cupertino headquarters.

27. Prior to May 1, AuthenTec shares had been trading over the previous three months (January 30, 2012 through April 30, 2012) at an average price of $3.33.

28. Between May 1 and July 27, 2012, AuthenTec and Apple negotiated both an acquisition and the aforementioned licensing agreement. Kerr's brother continued to be involved in those negotiations and continued coordinating AuthenTec's technology presentations to

COMPLAINT 5 CASE NO. C-_____

Apple.

29. Apple's dealings with AuthenTec were kept highly confidential and nonpublic. Given Apple's dominance in the tech industry, Kerr's brother understood the extremely sensitive nature of AuthenTec's discussions with Apple and was aware of the Company's non-disclosure agreements with Apple, which imposed significant monetary penalties for leaking information about Apple's interest in, and negotiations with, AuthenTec.

30. On July 27, 2012, AuthenTec publicly announced it had agreed to be acquired by Apple for $8 per share. AuthenTec's stock price closed at $8.42, a 60 percent increase from the previous day's closing price of $5.07. Apple's acquisition of AuthenTec was completed on October 4, 2012, with AuthenTec becoming a wholly-owned subsidiary of Apple.

**D. Kerr Learns Non-Public Information About AuthenTec's Negotiations With Apple**

31. On Friday, May 4, 2012, AuthenTec's CEO and Kerr's older brother began a series of weekend communications by text, phone and email. On either that day or Saturday, May 5, the CEO informed Kerr's brother of Apple's proposal to acquire AuthenTec. Among the subjects of discussion was a possible trip to Apple by AuthenTec executives in the upcoming days to further discuss the acquisition.

32. On May 5, in between his texts, emails and phone call with AuthenTec's CEO, Kerr's brother spoke twice with their mother by telephone for a total of ten minutes. The purpose of the calls was for the brother to arrange care for his son during his upcoming trip to Apple.

33. On Monday, May 7, shortly after midnight, the brother emailed AuthenTec's travel agent to request immediate travel arrangements to Cupertino. He copied his mother on the email. The mother received copies of the travel itinerary showing the brother flying to San Francisco on Wednesday, May 9.

COMPLAINT 6 CASE NO. C-_____

34. In fact, the brother flew to California on May 9, and on May 10 and 11, he and a group of AuthenTec's top executives met with and made presentations to Apple about AuthenTec and its technology. On May 11, AuthenTec and Apple entered a non-disclosure agreement, and Apple began conducting preliminary due diligence on AuthenTec's business and technology, in which Kerr's brother actively participated.

35. During the course of the brother's communications on May 5 and 7 with his mother about his upcoming trip and child care arrangements, the mother learned about AuthenTec's negotiations with Apple.

36. On May 7, 2012, at 12:36 p.m., the mother spoke with Kerr by telephone. The circumstantial evidence indicates Kerr learned information about the negotiations surrounding the proposed acquisition of AuthenTec during this call.

**E. Kerr Buys AuthenTec Stock Having Learned Of The Apple Negotiations**

37. Shortly after the phone call, at 1:16 p.m., Kerr logged into his online brokerage account, which he had opened in April 2010. Kerr had last logged into the account on March 11, 2012.

38. Kerr's online brokerage account was a margin account, a type of account in which an investor purchases stock using cash borrowed from the brokerage firm. The firm charges interest on the loan and uses the securities and cash in the account as collateral. If a security bought on margin decreases in value, the investor is responsible for covering the market loss by depositing additional cash or selling stock to cover the amount the investor owes to the brokerage firm, plus interest. A firm may also sell securities bought on margin to cover any margin deficiency. When he logged into the account on May 7, Kerr had a margin deficit of $8,000.

COMPLAINT 7 CASE NO. C-_____

39. At 1:25 p.m. on May 7, nine minutes after logging into his account, Kerr placed a market order for and bought 4,500 shares of AuthenTec on margin for $16,621. A market order means paying whatever sale price the market is offering, as opposed to a limit order, which limits the price the buyer is willing to pay.

40. In addition, just a few minutes later, at 1:40 p.m., Kerr placed another market order on margin for AuthenTec, purchasing 1,640 shares for $6,028.

41. Although Kerr had previously bought and sold AuthenTec shares, he had not traded in the Company's stock since November 2011. In addition, this May 7 purchase was Kerr's first trade of any kind in his brokerage account in 2012.

42. At 1:36 p.m., in between his two purchases, Kerr undertook a series of bank transfers. He transferred $1,000 from his checking account to his savings account. He then transferred $6,000 from his savings account to his brokerage account. The $6,000 transfer reduced Kerr's savings account balance to about $360.

43. Thus in the span of only about one hour after his phone call with his mother, Kerr purchased on margin 6,140 shares of AuthenTec at an average price of $3.69 per share. The net effect of the stock purchases and the bank transfer was to more than triple the margin balance – the amount Kerr owed the broker – from $8,000 to almost $25,000.

**F. Kerr Trades In His Mother-In-Law's Name and Continues Buying AuthenTec Stock**

44. On May 11, 2012, Kerr's mother traveled from Florida to visit Kerr and his family and see her new grandchild. She stayed until approximately May 15.

45. On May 16 Kerr opened a brokerage account in his mother-in-law's name. The mother-in-law had come to live with the Kerr family several weeks earlier. She did not speak English fluently, but through her daughter, Kerr's wife, had asked Kerr if he would take the $5,000 she had saved from her cleaning job to help her buy a house.

COMPLAINT 8 CASE NO. C-_____

46. Believing that the $5,000 would be an insufficient down payment on a house, Andrew instead opened a brokerage account with the money. At 5:05 p.m. on May 16, $4,500 was transferred from Kerr's wife's savings account to a joint checking account the wife held with the mother-in-law. The following day, May 17, that $4,500 was transferred from the mother-in-law's joint checking account to the brokerage account Kerr had opened for her.

47. That same day, Kerr placed a market order using all $4,500 in the mother-in-law's account to purchase 1,200 shares of AuthenTec stock. The mother-in-law had no knowledge of the securities industry or trading, and knew nothing about AuthenTec or that Kerr's brother worked at the company. Moreover, she believed from conversations with Kerr translated by Kerr's wife (her daughter) that Kerr was depositing her money into a savings account.

48. About 3½ hours later, still on May 17, Kerr in his own brokerage account placed another market order for 4,000 shares of AuthenTec on margin for nearly $15,000. The purchase upped his margin balance to almost $40,000.

49. Kerr, however, was not through with his AuthenTec buying. On May 29, 2012, Kerr bought another 1,190 shares of AuthenTec in his mother-in-law's account for $5,000 (this time with a limit order). The money for that purchase had actually come from Kerr himself through this circuitous route:

50. Fifteen days earlier, on May 14, Kerr had less than $200 in his checking account. Over the next two days, Kerr arranged to transfer cash, redeemed U.S. savings bonds, and $2,300 borrowed from a credit card company, into his checking account, leaving it with a balance of more than $5,000. On May 17, Kerr had the $5,000 transferred from his checking account to the mother-in-law's joint checking account, leaving a balance of less than $250 in his checking account. A week later, on May 24, Kerr facilitated the transfer of that $5,000 from the joint

COMPLAINT 9 CASE NO. C-_____

checking account to the mother-in-law's brokerage account. He then used the money to make the May 29 AuthenTec purchase in the mother-in-law's account.

51. A few days later, on June 4, continuing to trade on margin, Kerr placed his final market order for AuthenTec in his own trading account, buying 2,600 shares for almost $12,000.

### G. The Results of Kerr's Trading And The Acquisition Announcement

52. In summary, in less than a month in May and June 2012, Kerr bought 12,740 shares of AuthenTec in his own trading account, nearly doubling the shares of AuthenTec that he owned, and drove up his margin balance – his debt to the brokerage firm – from $8,000 to almost $52,000. That represented almost half his annual income at that time, which he was using to support his wife, mother-in-law, and three children.

53. Kerr bought another approximately 2,400 shares in the account in his mother-in-law's name for about $9,500 during the same time period. He did not buy or sell any other stocks from May through July 2012 in either account.

54. Furthermore, in using his checking and savings accounts to help fund his AuthenTec purchases, Kerr depleted both. By the end of June 2012, both accounts had negative balances.

55. Although Kerr had traded on margin previously, the loan amounts he incurred due to his May and June 2012 purchases of AuthenTec were high in comparison to his last purchase of AuthenTec in November 2011. At that time, he had purchased 3,050 shares of AuthenTec for approximately $9,400, all on limit orders. His margin balance at the end of November 2011 was approximately $15,500, less than one-third of balance he had by early June 2012.

56. Between May 7 and June 4, 2012, during the period Kerr traded, AuthenTec's average share price was $3.93. After the announcement on July 27, 2012, AuthenTec's stock

COMPLAINT 10 CASE NO. C-_____

price closed at $8.42. In August, Andrew began selling his AuthenTec shares in his brokerage account, using some of his profits to fund his checking account.

57. As a result of his insider trading, using the $8.42 closing price on July 27, Kerr's profits in his own account were $57,812. The profits in his mother-in-law's account using the same price were $10,627, for a total of $68,439.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

58. The Commission realleges and incorporates by reference Paragraphs 1 through 57, as if fully set forth herein.

59. The information Kerr misappropriated from his mother about the negotiations between Apple and AuthenTec, where his brother was an executive, was material and nonpublic.

60. Kerr knew or was reckless in not knowing that the information he misappropriated from his mother was material and nonpublic.

61. A duty of trust or confidence existed between Kerr and his mother. They had a history of sharing confidences with one another as child and parent and trusted that the other would keep those confidences.

62. Kerr knowingly or recklessly breached that duty of trust and confidence to his mother to keep the information about the AuthenTec-Apple negotiations confidential, and instead traded on it.

63. By virtue of the foregoing, Kerr, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material

facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business, which operated as a fraud or would operate as a fraud or deceit upon any person.

64. By engaging in the foregoing conduct, Kerr violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

**I.**

Permanently enjoining Kerr, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from directly or indirectly violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

**II.**

Ordering Kerr to disgorge, with prejudgment interest, all ill-gotten trading profits from the activities set forth in this Complaint;

**III.**

Ordering Kerr to pay a civil money penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

**IV.**

Granting such other relief as this Court may deem just and appropriate.

**V.**

Further, the Commission respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Date:  June 29, 2016

       s/Robert K. Levenson
Robert K. Levenson
Florida Bar No. 0089771
Senior Trial Counsel
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Ave., Suite 1800
Miami, FL  33131
Tel.: 305-982-6341
Fax: 305-536-4154
levensonr@sec.gov

COMPLAINT  13  CASE NO. C-_____